1
2
3
4
5
6
7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 GREGORY COLBERT,                    )          No. C 10-1675 RMW (PR)
                                       )
             Petitioner,               )          ORDER DENYING PETITION
12                                     )          FOR WRIT OF HABEAS
      vs.                              )          CORPUS; GRANTING
13                                     )          CERTIFICATE OF
                                       )          APPEALABILITY
14 WARDEN MICHAEL MARTEL,              )
                                       )
15           Respondent.               )
   _____)
16

17          Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus

18 pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition

19 should not be granted.  Respondent has filed an answer addressing the merits of the petition.

20 Petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the court

21 concludes that petitioner is not entitled to relief based on the claims presented and DENIES the

22 petition.

23                              **BACKGROUND**

24          Petitioner was charged with first degree murder of Glen Phason ("victim"), and

25 possession of a firearm by a felon.  (Petition Memo. at 1-2.)  It was also alleged that petitioner

26 personally discharged a firearm which caused death, and personally used a firearm.  (Id. at 2.)

27 The information also alleged one prior strike felony conviction, and three other prior felony

28 convictions.  (Id.)

At trial, the prosecution presented evidence that, on June 5, 2004, Lanika Evans was at petitioner's grandmother's house where she was supposed to meet the victim to bring him some clothes he had left at her apartment. (Resp. Ex. 6 at 2.) She arrived sometime before 11:30 p.m., and met petitioner and others. (Id.) She had never met petitioner before. (Id.) She and the victim left the house to buy a bottle of Hennessy, and on the way, the victim bought a bag of marijuana. (Id. at 3.) After they returned to the house, Evans did not drink any Hennessy, but she and the victim sat on the porch for about half an hour and then went inside the house. (Id.) Petitioner was guarding the front door with his shotgun. (Id.) Evans wanted to leave, but the victim asked her to wait so that he could go with her. (Id.) Evans smoked some marijuana but did not drink alcohol. (Id.) At some point during the night, the victim took Evans' car and left the house, not returning until the following morning. (Id.) Evans testified that she spent the night at the house even though she did not know anyone there. (Id.) The next morning, Evans thought petitioner was trying to scare her into assuring him that she would not tell anyone what had happened that night. (Id.) Evans began walking to a nearby gas station even though she was barefoot when petitioner told her to come back and he would tell the victim to return with her car. (Id.) Evans complied, and the victim soon drove up a few minutes later so that Evans could drive home. (Id. at 3-4.) During re-direct, the court lifted its previous restriction on Evans' testimony, and allowed Evans to testify that during the night, petitioner raped her. (Id. at 4.) Evans could not remember if petitioner mentioned being a member of the Nutcase gang, but she knew that the victim belonged to the Nutcase gang and had seen his tattoo. (Id. at 5.)

On June 7, 2004, petitioner and the victim were sitting in front of petitioner's grandmother's house when Larry Johnson joined them. (Id. at 1.) The three men spent some time together on the front porch "just chilling, socializing." (Id.) At some point, Johnson and the victim went to a store when they bought Hennessy, and then returned to the porch and drank from the bottle. (Id.) Later that night, the victim asked Johnson for a ride home. Petitioner went with them. (Id. at 2.) When they arrived at their destination, the victim and petitioner got out of the car and walked away. (Id.) After a minute or two, Johnson heard two gunshots. He looked up and saw petitioner tuck a shotgun under his coat. (Id.) Petitioner returned to the car and

1  warned Johnson not to say anything.  (Id.)  Johnson did not say anything to the police because he

2  was scared, and he avoided petitioner because he did not want to be involved.  (Id.)  Johnson had

3  heard that petitioner belonged to the Nutcase gang, and that contributed to his fear.  (Id.)  In

4  December 2004, Johnson was questioned by the police about the murder, and Johnson told them

5  what he knew about the shooting.  (Id.)

6         When the victim's body was discovered, police found an open bottle of Hennessy in his

7  pocket.  (Id. at 6.)  DNA from three different people was recovered from the bottle neck.  (Id.)

8  The victim and petitioner could not be excluded as two of the contributors.  (Id.)

9         During the defense case, Tanika Barber testified that she was petitioner's "on and off"

10  girlfriend since 1999 or 2000.  (Id.)  She was at his grandmother's house one night between June

11  4, 2004 and June 6, 2004 and worked on petitioner's dreadlocks from 9:00 p.m. to 2:30 a.m.

12  (Id.)  She could not have been there on June 7, 2004 because she worked in Pleasanton during

13  the week.  (Id.)  Barber did not see a gun in the house.  (Id.)  She never heard of the Nutcase

14  gang.  (Id.)  Deborah Colbert is petitioner's aunt who lived in his grandmother's house.  (Id.)

15  She also testified that petitioner never left the house because he was afraid that people were

16  trying to kill him.  (Id.)  Colbert testified that that on June 7, 2004, Barber was at the house

17  working on petitioner's hair from around 8:00 or 9:00 p.m. to 2:00 or 3:00 a.m.  (Id. at 7.)

18  Colbert never saw a gun in the house, nor did she ever see petitioner with a gun.  (Id.)  She also

19  never saw Johnson at the house that day or hear anyone sitting on the porch.  (Id.)  She saw

20  Evans at the house three times, including June 5, when Evans and the victim left around 1:00 or

21  2:00 a.m.  (Id.)  Colbert did not know who the Nutcases were.  (Id.)

22         After a jury trial, petitioner was found guilty of both counts.  (Petition Memo. at 2.)  The

23  jury also found true the weapon allegations, and found the prior strike conviction true.  (Id.)  On

24  March 23, 2007, the trial court sentenced petitioner to a total term of 75-years to life.  (Id. at 2-

25  3.)

26                              **DISCUSSION**

27  A.   Standard of Review

28         This court may entertain a petition for writ of habeas corpus "in behalf of a person in

1    custody pursuant to the judgment of a state court only on the ground that he is in custody in

2    violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

3    Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

4    may not grant a petition challenging a state conviction or sentence on the basis of a claim that

5    was reviewed on the merits in state court unless the state court's adjudication of the claim

6    "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

7    clearly established federal law, as determined by the Supreme Court of the United States; or

8    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

9    the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong

10   applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529

11   U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual

12   determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

13        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

14   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15   law or if the state court decides a case differently than [the] Court has on a set of materially

16   indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an

17   "unreasonable application of" Supreme Court authority, falling under the second clause of

18   § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

19   Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

20   case." Id. at 413. The federal court on habeas review may not issue the writ "simply because

21   that court concludes in its independent judgment that the relevant state-court decision applied

22   clearly established federal law erroneously or incorrectly." Id. at 411.

23        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

24   will not be overturned on factual grounds unless objectively unreasonable in light of the

25   evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

26        In determining whether the state court's decision is contrary to, or involved an

27   unreasonable application of, clearly established federal law, a federal court looks to the decision

28   of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

1  LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000).  Here, that decision is the California

2  Court of Appeal.

3  B.     Petitioner's Claims

4         As grounds for federal habeas relief petitioner claims that: (1) the trial court violated

5  petitioner's right to self-representation by revoking petitioner's Faretta status; (2) the trial court

6  violated petitioner's right to a fair trial by admitting prejudicial evidence of gang membership

7  and activity; (3) the trial court violated petitioner's right to a fair trial by admitting prejudicial

8  evidence of petitioner's sexual assaults and rapes, and counsel was ineffective for "opening the

9  door" to the admission of evidence of petitioner's rapes and sexual assaults; (4) the evidence was

10  insufficient to sustain a first degree murder conviction; and (5) the cumulative effect of these

11  errors resulted in a miscarriage of justice.

12         1.     Right to self-representation

13         Prior to trial, petitioner filed two motions to substitute counsel, Theodore Berry, pursuant

14  to People v. Marsden, 2 Cal. 3d 118 (1970).  Both motions were denied.  On April 21, 2006,

15  petitioner made another motion to substitute counsel and was denied.  Thereafter, he moved to

16  represent himself.  The trial court set the matter for a hearing on April 25, 2006.  At that hearing,

17  the trial court conducted an extensive colloquy with petitioner regarding the dangers of self-

18  representation.  (Resp. Ex. 2, Vol. 6.)  Judge Sarkisian informed petitioner that if he wanted

19  appointed counsel, his only choice was Mr. Berry, and he would not receive a different attorney.

20  (Id., RT 4-5.)  Petitioner consistently stated that if his only choice of appointed counsel was Mr.

21  Berry, he would rather represent himself.  (Id., RT 8-9.)  Judge Sarkisian set another hearing for

22  May 17, 2006, so that the petitioner could think about whether he wanted Mr. Berry as advisory

23  counsel, and also to resolve any outstanding discovery matters.  (Id., RT 11.)

24         On May 17, 2006, Judge Hymer presided over petitioner's hearing.  (Resp. Ex. 2, Vol. 7.)

25  Judge Hymer acknowledged that petitioner was appearing pro se, having been granted his right

26  to self-representation.  (Id., RT 1.)  Judge Hymer also noted that on May 3, 2006, Mr. Berry filed

27  a motion to advance the hearing date on behalf of petitioner, after petitioner requested that the

28  hearing date be moved to an earlier date.  (Id.)  Judge Hymer also observed that within the court

file was a letter from petitioner dated May 5, 2006, stating, in part, "Your Honor, I know I need an attorney for this homicide case, and I need all the good help I can get." (<u>Id.</u>)

Judge Hymer asked petitioner if he read that statement correctly. (<u>Id.</u>) The following exchange occurred:

> Petitioner:     Yeah.  I wrote the letter to Judge Clay and I asked him because me and Mr. Berry don't see eye to eye.  If we having problems, meaning he's not filing none of my motions, right, and I asked –
>
> The Court:     Well, before that, are you making a motion to be represented by an attorney to revoke your <u>Faretta</u> status?
>
> Petitioner:     That's if, um, if they, um, can assign me another attorney besides Mr. Berry.  If not –
>
> The Court:     Well, I'm going to find based on this record that your request for Faretta status is equivocal, and, therefore, that you should not be representing yourself.  Therefore, I will reappoint Mr. Berry to represent you.  I take it, Mr. Berry, you're not retained in this case.  You have been referred by the Court Appointed Program?
>
> Petitioner:     No.  See, when I wrote that letter to Don Clay, I wrote that letter as far as my motions being filed.  And I asked him, right, that if I could have another attorney.  I'm not – I'll stay pro per, because Mr. Berry, I'm not representing – I don't want him representing me.
>
> The Court:     It's for that reason that I find your <u>Faretta</u> request to represent yourself is equivocal.  In other words, you don't really want to represent yourself.  You just want a different attorney than Mr. Berry.
>
> Petitioner:     No, I do want to represent myself, and that ain't all I wrote in that letter.  You just –
>
> The Court:     Based on the record, I don't believe you.  So I'm finding that the motion to represent yourself is equivocal and Mr. Berry is reappointed.

(<u>Id.</u>, RT 2-3.)  Petitioner then continued to try to convince Judge Hymer that he in fact did wish to represent himself.  Petitioner attempted to file another motion to represent himself, as well as a motion to dismiss Mr. Berry as his attorney.  (<u>Id.</u>, RT 3.)  Both motions were denied.  (<u>Id.</u>, RT 3-4.)

A criminal defendant has a Sixth Amendment right to self-representation.  <u>Faretta v. California</u>, 422 U.S. 806, 832 (1975).  A defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay.  <u>Id.</u> at 835.  The denial of the right to self-representation is structural error not

1  subject to harmless error analysis.  See McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984).

2        On direct appeal, petitioner argued that the trial court's termination of petitioner's Faretta

3  status violated his right to self-representation.  The California Court of Appeal disagreed.  It

4  concluded that the trial court's ruling that petitioner's statements and actions were an equivocal

5  request to represent himself was reasonable because:  (1) petitioner originally invoked Faretta

6  only after his requests to substitute Mr. Berry were denied; (2) even after he was granted his

7  Faretta status, petitioner asked counsel to file a motion to advance the next hearing date; (3) as

8  petitioner was proceeding pro se, petitioner sent a letter to the court asking for appointment of

9  counsel; and (4) petitioner confirmed that he was willing to revoke his Faretta status if he could

10 have a different attorney from Mr. Berry.  (Resp. Ex. 6 at 10-12.)

11       This court must review petitioner's claim through the lens of the AEDPA's extremely

12 deferential standard of review.  Here, there is no clearly established Supreme Court precedent

13 setting forth the standard to determine whether a defendant, who has knowingly and voluntarily

14 waived his right to counsel, must establish that his request remains unequivocal at later stages of

15 the proceeding.[1]  Cf. John-Charles v. California, 646 F.3d 1243, 1249 (9th Cir. 2011) (finding no

16 Supreme Court case clearly addressing the right to re-assert a Sixth Amendment right to counsel

17 "later in the same stage of [defendant's] criminal trial.").  Notwithstanding the lack of clearly

18 established Supreme Court precedent on this narrow issue, this court must consider whether the

19 state court's reappointment of counsel after a Faretta waiver constitutes an unreasonable

20 application of the general principles enunciated in Faretta.  Id.  Cognizant that the more general

21 the rule that is considered, "the more leeway courts have in reaching outcomes in case-by-case

22 determinations," id., the court concludes that the California Court of Appeal did not

23 unreasonably apply Faretta.

24       Once the right to the assistance of counsel has been competently waived, it does not

25

26       [1] However, the law is clearly established that once Faretta is granted, a trial court can
terminate that right if it finds that the defendant is engaging in misconduct.  See Faretta, 422
27 U.S. at 834 n.46.  However, here, the state courts did not interpret the events in such a manner.
Rather, the state courts interpreted petitioner's actions and statements as an equivocal request to
28 maintain his Faretta status.

1   follow that a new waiver must be obtained at every subsequent court appearance by the

2   defendant, "unless intervening events substantially change the circumstances existing at the time

3   of the initial [Faretta] colloquy."  United States v. Hantzis, 625 F.3d 575, 580-81 (9th Cir. 2010).

4   Several other circuits have agreed that a defendant's waiver of counsel is carried over to later

5   proceedings, absent a substantial change in circumstances, and thus, a court is not required to ask

6   defendant if he still wishes to represent himself.  Id. at 581 n.7 (listing cases).  On the other hand,

7   this circuit has intimated that, while the re-inquiry is not mandated, it is not erroneous to confirm

8   a defendant's continued intent to represent himself.  See, e.g., United States v. Farhad, 190 F.3d

9   1097 (9th Cir. 1999); United States v. Van Krieken, 39 F.3d 227, 229-30 (9th Cir. 1994).  In the

10  absence of any clearly established Supreme Court precedent, and the lack of federal cases

11  suggesting that a re-inquiry of a pro se defendant's wish to represent himself would be improper,

12  this court concludes that the state court's decision was not an unreasonable application of

13  Faretta.  See 28 U.S.C.§ 2254(d)(1).

14          Further, the state court's determination that petitioner's statements and actions

15  demonstrated an equivocal request for self-representation was not "an unreasonable

16  determination of the facts."  28 U.S.C. § 2254(d)(2).  Cf. United States v. Kienenberger, 13 F.3d

17  1354, 1356 (9th Cir. 1994) (expressly considering as a question of fact whether a defendant

18  made an unequivocal Faretta request).

19          In this circuit, a waiver is not considered equivocal merely because defendant chooses

20  self-representation rather than to be represented by counsel he believes to be incompetent.

21  United States v. Allen, 153 F.3d 1037, 1041 (9th Cir. 1998); see also United States v.

22  Hernandez, 203 F.3d 614, 617-18 (9th Cir. 2000) (defendant's statement to judge, "if you cant

23  change [my attorney], I'd like to represent myself" may have been conditional, but it was not

24  equivocal).

25          However, a defendant's expression of a clear preference for receiving new counsel over

26  representing himself may be an indication that the request is equivocal.  See Stenson v. Lambert,

27  504 F.3d 873, 883 (9th Cir. 2007) (state court's determination that defendant had not made an

28  unequivocal request was not an unreasonable determination of the facts where defendant made

1  several statements that he really did not want to represent himself but felt the court and his

2  existing counsel were forcing him to do so, defendant had tried to locate another attorney and

3  had not included a request to represent himself in his final written request for new counsel, and

4  requested a particular co-counsel be retained as his counsel).  In addition, in certain

5  circumstances, a <u>pro se</u> defendant can waive his right to self-representation.  <u>See, e.g.</u>, <u>McKaskle</u>

6  <u>v. Wiggins</u>, 465 U.S. 168, 182 (1984) ("A defendant's invitation to counsel to participate in the

7  trial obliterates any claim that the participation in question deprived the defendant of control

8  over his own defense.  Such participation also diminishes any general claim that counsel

9  unreasonably interfered with the defendant's right to appear in the status of one defending

10  himself.").

11      Petitioner's case is strikingly similar to <u>Adams v. Carroll</u>, 875 F.2d 1441 (9th Cir. 1989).

12  In that pre-AEDPA case, after the defendant's motion to substitute counsel had been denied, the

13  defendant made an express statement that he would rather represent himself than be represented

14  by his attorney, Mr. Carroll.  <u>Id.</u> at 1442.  The defendant represented himself for six weeks, and

15  then again requested appointment of a different attorney.  <u>Id.</u>  That request was denied.  <u>Id.</u>

16  Three weeks later, the defendant requested appointment of co-counsel, which was denied.  <u>Id.</u>

17  More than a month later, the defendant made another request for appointment of counsel other

18  than Mr. Carroll.  <u>Id.</u>  The trial court granted defendant's motion, and Mr. Carroll was reassigned

19  to the case.  <u>Id.</u> at 1443.  The defendant objected at four subsequent hearings, and at each

20  hearing, defendant made clear that he would rather represent himself than be represented by Mr.

21  Carroll.  <u>Id.</u>  The Ninth Circuit concluded that the defendant's requests for counsel did not

22  demonstrate vacillation because his position was consistent that his desire was to represent

23  himself if the only alternative was the appointment of Mr. Carroll.  <u>Id.</u> at 1444-45.  "While

24  [defendant's] requests no doubt were conditionc̣n they were not equivocal."  Id. at 1445.  Notably,

25  in <u>Adams</u>, the Ninth Circuit reviewed the state court's decision <u>de novo</u>.

26      Regarding section 2254(d)(2), a state court factual determination is unreasonable if it is

27  "so clearly incorrect that it would not be debatable among reasonable jurists."  <u>Jeffries v. Wood</u>,

28  114 F.3d 1484, 1500 (9th Cir. 1997).  Here, the state court recognized that petitioner only asked

1 | to represent himself after his motions to substitute Mr. Berry were denied, petitioner used Mr.

2 | Berry to file an insubstantial motion not long after he was granted the right to represent himself,

3 | and petitioner asked for appointment of an attorney after being granted his <u>Faretta</u> right because

4 | he recognized that homicide was a serious charge.  Although this court mc{ have made a

5 | different determination, if it wgtg reviewing this case'de novo, it cannot be said that, based on

6 | these facts, the state court's determination was objectively unreasonable.  <u>See</u> 28 U.S.C.

7 | § 2254(d)(2).

8 |           2.        <u>Admission of gang membership</u>

9 |           Prior to trial, defense counsel objected to the introduction of any evidence that petitioner

10 | was a member of the Nutcase gang because there was no known connection between the gang

11 | membership and the underlying murder.  (RT 48-49.)  The trial court overruled counsel's

12 | objection, and, relying on California law, explained its decision.  (RT 94-99.)  In California, case

13 | law allows evidence that a witness is afraid to testify because that fear is relevant to the

14 | credibility of the witness.  (RT 94.)  Further, the California courts are consistent in explaining

15 | that the basis for the fear is also relevant to credibility, and is within the discretion of the trial

16 | court to allow it.  (RT at 95.)  The trial court concluded that it would permit witnesses to testify

17 | that they were afraid to testify because of inferred threats from petitioner, and that the basis for

18 | their fears was in part because they believed petitioner was a member of the Nutcase gang.  (RT

19 | 98-99).  The trial court also ruled that it would give a limiting instruction as to the statements

20 | regarding the witnesses' belief that petitioner was a member of the Nutcase gang.  (RT 99.)

21 |           The admission of evidence is not subject to federal habeas review unless a specific

22 | constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

23 | the fundamentally fair trial guaranteed by due process.  <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021,

24 | 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of

25 | irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

26 | issuance of the writ."  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that

27 | trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under

28 | Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established

1  Federal law under § 2254(d)).  Failure to comply with state rules of evidence is neither a

2  necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  See

3  Henry, 197 F.3d at 1031.  Only if there are no permissible inferences that the jury may draw

4  from the evidence can its admission violate due process.  See Jammal v. Van de Kamp, 926 F.2d

5  918, 920 (9th Cir. 1991).

6          On direct appeal, petitioner argued that evidence of his gang membership violated his

7  right to due process because the evidence was irrelevant, and even if it were relevant, it was

8  overly prejudicial, in violation of the California Rules of Evidence and federal due process.  The

9  California Court of Appeal disagreed.  It stated that Johnson testified that he understood

10  petitioner to have threatened him, and the gang evidence was relevant to the determination of

11  credibility, which was important for the jury to consider in order to assess Johnson's credibility.

12  (Resp. Ex. 6 at 15.)  It also rejected petitioner's assertion that the evidence was unduly

13  prejudicial under state law.  (Id. at 16.)

14          The California Court of Appeal's rejection of this claim was not contrary to, or an

15  unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C.

16  § 2254(d)(1); Holley, 568 F.3d at 1101.  Moreover, the state court reasonably concluded that

17  witness' belief that petitioner was a member of the Nutcase gang was admissible because it was

18  relevant to determine the witness' credibility.  See People v. Olguin, 31 Cal. App. 4th 1355,

19  1368 (1994) ("A witness who testified despite fear of recrimination of any kind by anyone is

20  more credible because of his or her personal stake in the testimony."); Cf. United States v. Abel,

21  469 U.S. 45, 49 (1984) (evidence of gang membership admissible on issue of bias); United

22  States v. Santiago, 46 F.3d 885, 890 (9th Cir. 1995) (recognizing that gang-related testimony that

23  only addressed the witnesses' fear of retaliation was admissible on the issue of credibility);

24  United States v. Keys, 899 F.2d 983, 987 (10th Cir. 1990) (evidence of gang membership

25  admitted to show that testimony could be influenced by fear of retaliation).  Because there was a

26  permissible inference that the jury could draw from the admission of evidence regarding

27  petitioner's gang membership, its admission did not violate due process, especially in light of the

28  trial court's limiting instruction.

1    Accordingly, petitioner is not entitled to federal habeas relief on this claim.

2        3.    Admission of rape testimony

3        Prior to trial, the trial court ruled that Evans would not be allowed to testify as to her

4    allegation that petitioner raped her or threatened her not to tell anyone about the rape while

5    mentioning his affiliation with the Nutcase gang.  (RT 59-61, 99.)  However, the trial court

6    stated that Evans could testify that, while he was loading a shotgun, petitioner threatened to kill

7    her if she went to the police.  (RT 99-101.)  The trial court reasoned that the jury was entitled to

8    learn why Evans feared going to the police, and the basis behind that fear, for the purpose of

9    assessing credibility.  (RT 100-01.)

10       During Evans' testimony on direct, she answered the prosecutor's questions regarding

11   whether petitioner threatened her or if she was afraid by stating things like, "he basically was

12   just like, what happened?" (RT 347); and "Just I wouldn't say he was trying to scare me because

13   I wasn't scared.  I was like traumatized, like the whole situation just completely what happened,

14   I was ready to go" (id.); "[I was scared] a little bit, but more just I was traumatized, ready to go";

15   (RT 351); and Evans testified that she didn't feel comfortable.  Defense counsel attempted to

16   clarify Evans' testimony during cross-examination to elicit testimony regarding whether

17   petitioner made direct threats or not.  In responding to defense counsel's questions, Evans

18   answered ambiguously.  (Resp. Ex. 6 at 19.)  Some of Evans' responses to defense counsel's

19   questions tended to raise more questions.  For example, "I couldn't get out the front door.  I was

20   trying to leave.  I didn't make it to the door."  (RT 388); "I never went to sleep. (RT 389); "He

21   brought up am I going to tell someone, or if I'm going to tell . . ." (RT 396).

22       The parties revisited the court's ruling regarding the exclusion of testimony about the

23   rape, and the trial court agreed with the prosecutor that because of the ambiguous responses

24   Evans was giving to defense counsel in light of the trial court's restriction, the rape testimony

25   would be admitted.

26       On direct appeal, the California Court of Appeal ruled that the trial court properly re-

27   weighed the evidence during examination of Evans and determined that it was not unduly

28   prejudicial.  (Resp. Ex. 6 at 19.)  Moreover, the appellate court concluded that the testimony was

1   "highly relevant to the context and credibility" of Evans' testimony.

2   The California Court of Appeal's rejection of this claim was not contrary to, or an

3   unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C.

4   § 2254(d)(1); Holley, 568 F.3d at 1101. For the same reason as the evidence of petitioner's

5   membership in the Nutcase gang was relevant, the state court reasonably concluded that

6   admission of Evans' fear of recrimination was relevant as to the issue of Evans' credibility. See

7   People v. Olguin, 31 Cal. App. 4th at 1368. Because there was a permissible inference that the

8   jury could draw from the admission of evidence regarding Evans' allegation of rape, its

9   admission did not violate due process, especially in light of the trial court's limiting instruction.

10  See Jammal, 926 F.2d at 920. Further, as the California Court of Appeal noted, even if the

11  admission of the rape testimony was erroneous, any error was harmless in light of the substantial

12  evidence against petitioner. Even without the rape testimony, the evidence demonstrated that

13  petitioner brought a shotgun with him when he accompanied Johnson and the victim to the

14  victim's house; petitioner got out of the car with the victim; Johnson heard two shots and then

15  saw petitioner return to the car after collecting the spent shells; and petitioner threatened Johnson

16  not to tell anyone.

17  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

18  Relatedly, petitioner's claim that counsel was ineffective for "opening the door" to the

19  rape testimony is equally without merit. In order to prevail on a Sixth Amendment

20  ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish

21  that counsel's performance was deficient, i.e., that it fell below an "objective standard of

22  reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668,

23  687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient

24  performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

25  errors, the result of the proceeding would have been different." Id. at 694. A reasonable

26  probability is a probability sufficient to undermine confidence in the outcome. Id.

27  The California Court of Appeal rejected petitioner's claim, concluding that it was a

28  reasonable decision for defense counsel to try to establish that petitioner did not actually threaten

1   Evans in order to undermine her testimony and credibility.  (Resp. Ex. 6 at 18.)

2       The California Court of Appeal's decision was not contrary to, or an unreasonable

3   application of Strickland.  See 28 U.S.C. § 2254(d)(1).  After Evans' direct testimony, in which

4   she did not affirmatively say that petitioner threatened her, it was reasonable for defense counsel

5   to make the strategic decision to try to clarify Evans' responses.  If, in fact, petitioner did not

6   threaten Evans, that evidence could undermine her credibility.  Further, as stated above, even

7   with the admission of the rape testimony, there is not a reasonable probability that, but for

8   counsel's alleged error, the result of the proceeding would have been different.  Id. at 694.

9       Accordingly, petitioner is not entitled to federal habeas relief on this claim.

10      4.    Insufficient Evidence

11      Petitioner claims that there was insufficient evidence of premeditation or deliberation.

12  Petitioner argues that the evidence was insufficient because Johnson was the only witness who

13  was present at the time of the shooting, and petitioner never discussed shooting or killing the

14  victim, there was no argument between petitioner and the victim, and nothing led Johnson to

15  believe that there would be a shooting.

16      The Due Process Clause "protects the accused against conviction except upon proof

17  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

18  charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

19  evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

20  a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

21  claim.  See Jackson v. Virginia, 443 U.S. 307, 321 (1979).  Only if no rational trier of fact could

22  have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  Id.

23  at 324.  Under Jackson's standard of review, a jury's credibility determinations are entitled to

24  near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  To grant relief, a

25  federal habeas court must conclude that "the state court's determination that a rational jury could

26  have found that there was sufficient evidence of guilt, i.e., that each required element was proven

27  beyond a reasonable doubt, was objectively unreasonable."  Boyer v. Belleque, 659  F.3d 957,

28  965 (9th Cir. 2011).

1    The California Court of Appeal rejected this claim.  Under California law, evidence of

2    planning activity, motive, and the manner of killing are helpful to support a finding of

3    premeditation and deliberation.  (Resp. Ex. 6 at 20.)  The appellate court concluded that there

4    was a considerable amount of evidence of planning.  (Id.)  It noted that Evans saw petitioner at

5    his grandmother's house with a shotgun two days before the murder; on the night of the murder,

6    Johnson saw petitioner and the victim get out of the car, heard two gunshots, and saw petitioner

7    retrieve the shells from the sidewalk; and Johnson saw petitioner tuck the shotgun back into his

8    coat.  (Id.)

9    In light of the evidence, the California Court of Appeal's determination that there was

10   ample evidence of premeditation and deliberation was objectively reasonable.  Petitioner is not

11   entitled to federal habeas relief on this claim.

12       5.    Cumulative Evidence

13   In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

14   the cumulative effect of several errors may still prejudice a defendant so much that his

15   conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003)

16   (reversing conviction where multiple constitutional errors hindered defendant's efforts to

17   challenge every important element of proof offered by prosecution).  However, where there is no

18   single constitutional error existing, nothing can accumulate to the level of a constitutional

19   violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v. Roe, 182 F.3d

20   699, 704 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  Similarly, there

21   can be no cumulative error when there has not been more than one error.  United States v.

22   Solorio, No. 10-10304, 2012 WL 161843, * 11 (9th Cir. Jan. 20, 2012).  Here, because petitioner

23   has not identified any error, there is no cumulative error warranting federal habeas relief.

**CONCLUSION**

25   The petition for a writ of habeas corpus is DENIED.

26   Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to

27   rule on whether a petitioner is entitled to a certificate of appealability in the same order in which

28   the petition is denied.  Reasonable jurists could find the court's denial of petitioner's claim that

1    he was denied his right to self-representation debatable.  <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473,

2    484 (2000).  Thus, a certificate of appealability is GRANTED on that claim, and denied as to the

3    remaining claims.

4            The clerk shall enter judgment and close the file.

5            IT IS SO ORDERED.

6    DATED: _____

7                                        _____
                                          RONALD M. WHYTE
8                                          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


GREGORY COLBERT,                           Case Number: CV10-01675 RMW

         Plaintiff,                      **CERTIFICATE OF SERVICE**

  v.

MICHAEL MARTELL et al,

         Defendant.
_____/


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 28, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Gregory Colbert F 70955
Mule Creek State Prison
A3-117 Low Cell
P.O. Box 409020
Ione, CA 95640


Dated: March 28, 2012

                         Richard W. Wieking, Clerk
                         By: Jackie Lynn Garcia, Deputy Clerk